JOHN JOHNSTON.

*vs.*

RICHARD H. CLARKE AND DANIEL RATCLIFF, TRUSTEES
OF THE POTOMAC BUILDING ASSOCIATION.

IN EQUITY.   DECIDED APRIL 6, 1857.

*For an Injunction.*

A number of persons enter into mutual agreement to subscribe and pay into a common fund by regular instalments, say $1 per month for each share a member may take, until the fund has accumulated so as to divide $200, or any given amount, to a share; at which period the partnership is to cease; and to secure punctuality, each member neglecting his monthly payments is subjected to a fine, say of 10 cents upon every dollar he fails to pay at the regular monthly meetings. The period of distribution is hastened, and the common fund made productive by authorizing any member to make a composition sale of his interest in the ultimate distribution, to the other members of the association. Thus, whenever there are funds enough in the treasury for the purchase of one or more shares at any regular meeting of the association, the member who bids the highest premium, or in other words, agrees to take the lowest price, is paid the price so bid by him for his ultimate share. He remains, however, a member of the society until the close, paying thenceforth a double instalment on his shares, $2 per month on each, instead of $1, and subject to all the regulations of the society, liable to attend its meetings and to do any duties which might be devolved upon any other member, and liable to the regulated fines, in default of punctual payment of monthly contributions or any other default under the rules. To secure a compliance with his contract to the company, the member making such composition of sale executes his bond in the penalty of the ultimate value of the share sold, conditioned for the faithful payment of the monthly dues thereafter to accrue, and all fines and forfeitures which may under the rules be imposed on him for any defaults. He also executes a deed of trust, conveying real estate, to secure a compliance with the condition of the bond. There is in the bond and deed no stipulation for the return of the principal sum advanced to the member, nor is it at all in the power of the society to compel its return if he fulfill the conditions of the bond and deed of trust.

Held: 1. Such stipulations entered into are not, on their face, a device to cover a usurious loan; and such a transaction is not usurious upon its face.

2. This was a dealing with the partnership funds, in which the complainant had an interest in common with the members of the society, and was not a loan; the complainant was interested in the money when it was advanced and when it was repaid.

3. An injunction to restrain a sale under the deed of trust ought to be refused.

Messrs. CARLISLE and MAURY, counsel for complainant.

Messrs. BRADLEY and BRADLEY and others, counsel for defendant.

Johnston filed a bill praying for a special injunction of the Court to release him from the payment of certain bonds and forfeitures due the Potomac Building Association, for money advanced by the society on certain shares of stock held by Johnston in the society, on the ground that the contract between the association and the applicant was illegal, and the action of the association usurious.

The complainant gave a deed of trust to secure a loan of $260. That since making the loan he had paid $239. That the association claims there is due $203.50, and on default of the payment are about to make a sale of the premises, north half of lot 24, in square 732. That the contract and transactions between the complainant and the association are usurious. That he may be credited with the sum paid, and that the interest may be adjudged according to equity, and that the trustees be enjoined from selling the property.

Advance was purchased by the complainant on his two shares of stock at a premium of 35 per cent. May 3d, 1851.

Judge Merrick delivered the opinion of the Court as follows:

"The complainant is a member of one of those voluntary associations, with the principles and modes of operation of which the public has long been familiar, under the denomination of building associations, and brings his bill into this Court against the Trustees of the association, to restrain the enforcement of the stipulations he has entered into with them in the usual conduct of the business of the association, and in furtherance of the objects for which he, and all its

other members enter into the co-partnership, upon the ground that those stipulations are usurious, unconscionable and oppressive. This case is understood to raise the question, presented by several of like character on the docket, of the lawfulness of the operations of this class of associations, and of a large number of kindred societies which are known as benefit societies, and have as their ostensible object the accumulation of a fund for each of their members by the periodical contribution of small savings, which are made productive by being advanced in certain amounts to individual members in the form of composition sales of their interests. All these societies combine two leading features, viz: hoarding savings and making profits by compounding interest on the savings, on substantially the same principles as saving banks and mutual insurance companies, by the following simple process: A number of persons enter into a mutual agreement to subscribe and pay into a common fund, by regular instalments, say one dollar per month, for each share the member may take, until the fund shall have accumulated so as to divide $200, or any other given amount to each share, at which period the partnership is to cease, and the share of each member thus accumulated will be a fund for him to purchase a small freehold tenement, or to be applied to any other prudential use he may determine; and to secure punctuality each member neglecting his monthly payments is subjected to a fine, say of ten cents upon every dollar he fails to pay at the regular monthly meetings. The period of distribution is hastened and the common fund made productive by authorizing any member to make a composition sale of his interest in the ultimate distribution to the other members of the association. Thus, whenever there are funds enough in the treasury for the purchase of one or more shares at any regular meeting of the association, the member who bids the highest premium, or in other words agrees to take the lowest price, is paid the price so bid by him for his ultimate share. He remains, however, a member of the society until the close, paying thenceforth a double monthly instalment on his shares, $2 per month on each instead of $1, and subject to all the regulations of the society, liable to attend its meet-

ings and to do any duties which might be devolved upon any other member, and liable to the regulated fines in default of punctual payment of monthly contributions, or any other default under the rules. Whenever a sale of this kind is effected, it is manifest that unless some arrangement is made the society has no security that the member who has been advanced by his sale his ultimate share of profits will continue to bear his proportion of the burden of mutual contribution; therefore a bond in the penalty of the ultimate value of the shares sold and a deed of trust upon real estate is executed to the society, conditioned for his faithful payment of the monthly dues thereafter to accrue, and all fines and forfeitures which may, under the rule, be imposed on him for any defaults. There is in the bond and deed no stipulation for the return of the principal sum advanced to the member, nor is it at all in the power of the society to compel its return if he fulfill the conditions of the bond and deed of trust. Should the member fail to comply, the bond and deed of trust become forfeit, and the society may direct a sale of the property conveyed by the deed to raise the amount of damages which are ascertained and liquidated by the deed of trust, and which are usually the return to the society of the advance paid upon the bid of the member, with interest thereon, all the monthly dues and fines which may be in arrear; and the member is then and thereby reinstated in the condition of a member who has had no advance, and has paid his dues and fines, &c.

The facts in the present case conform to the general scheme I have mentioned. John Johnston is a member of the Potomac Building Association, consisting of 176 members. On the 5th of May, 1851, he received from the society $260, bid on 2 shares of the ultimate value of $400. In other words, he sold to the members at 35 per cent: discount, and gave bond and deed of trust for the payment of double monthly dues thenceforth, or $4 per month, and for such fines and forfeitures as he might incur; and falling in arrear for dues and fines in December, 1856, the Trustees under the deed of trust advertised the property for sale, and he has filed his bill charging that the stipulations he entered into were only a

device to cover an usurious loan, and praying to be discharged from his contract on payment of the principal sum of $260, with interest from May 5th, 1851, and to be released from the fines incurred by him as a member of the society, and to enjoin a sale of the property by the Trustees. The Trustees in their answer deny that there was any corrupt intent or secret agreement to effect an usurious loan under the forms of stipulations entered into by parties, and sets out the bond, deed of trust, articles of association, &c., and aver that the contract was *bona fide* entered into and made and intended to be what it appears on the face of the papers, and none other. In the present stage of the cause the answer must be taken as true, that the contract between the parties was whatever it appears to be, and there was no other and different agreement behind the ostensible arrangement. Were there another secret agreement to make an usurious loan, to which the stipulations here shown were but an outward covering, and it were so charged in the bill by proper averments, it would become necessary, before a final hearing, to send down a case to a jury to ascertain whether there be in fact a secret, corrupt, usurious agreement for a loan; for whatever form parties adopt to hide usury, if they have secretly made a corrupt loan, the law will drag away the veil and penetrate the motive. But I do not understand the bill to charge any different agreement from that disclosed by the answer, and the question before us is therefore not one of intention, but one of construction upon the face of the articles of association, bond and deed of trust exhibited with the answer. As a question of construction it seems to me, both upon principle and authority, that stipulations like those we are considering are not usurious. To constitute usury, there must be a loan of money in which the principal sum is not hazarded, and is to be repaid at all events with more than legal interest. There was a time in the history of the law when the taking of any interest for the use of money was an heinous offence; but "usury has long since lost that deep moral stain which was formerly attached to it, and is now generally considered only as an illegal or immoral act, because it is prohibited by law." Lloyd *vs.* Scott, 4 Pet. 224. With this high warrant

for a lenient construction of a penal law, no Court should pronounce a contract usurious in which any of the elements of the definition are wanting, or which is within the exemption of adjudicated cases; but, on the contrary, should seek to enforce the principle that every man has a right to make what contracts he pleases, if not restrained by some law, and that justice and equity require that such contracts should be executed if fairly made. The very point involved in the present case was decided in Silver and Barnes, 6 Bingham, new cases 180 (decided in 1839, after the Act of George IV.) Tindall, Chief Justice, says, "The question was whether the transaction was a loan of money or a dealing with the partnership funds. If it was a loan, it was usurious. We think it was a dealing with the partnership funds, in which the defendant had an interest in common with the other members of the society, and that it was not a loan; the defendant was interested in the money when it was advanced and when it was repaid. The rules of the society are in effect a mere agreement by the partners that their joint contributions shall be advanced for the use of one or other, as occasion requires, and the transaction was not a borrowing by the maker of the note from the payees."

In a later case Burbridge *vs*. Cotton, 8 Eng. Law and Equity 62, Sir J. Parker says, "The case of Silver *vs*. Barnes was a direct authority, that an advance out of the funds of an association of this kind, made pursuant to its rules, to one of its members, having in common with other members an interest in the fund out of which the advances were made and in the money to be repaid to him, was not a loan of money, but a dealing with the partnership funds, and was not usurious. He was not aware that the authority of that case had ever been doubted. It had been approved by Parker Baron, in Cutbill *vs*. Kingdom, and he considered that a decision of a Court of law on such a subject was binding in this Court." To the same effect are the cases of Seagrave *vs*. Pope, 15 Eng. Law and Equity, 480; Mosley *vs*. Barker, 6 Hare, 87, and other cases. It has been supposed that the cases of Silver *vs*. Barnes, Burbridge *vs*. Cotton, and all the others rest the principles of

their decision upon the late English statutes of 7 Wm. IV, and 7 and 8 Vic., and also a previous statute of Geo. IV, for the regulation of certain joint-stock associations. But this is a total mistake, as may be found by consulting Wadsworth, on Joint Stock Companies, as well as the cases themselves. They do not profess to rest upon a statutory privilege, but upon common law principles. These statutes had their origin with the statute of 6 Geo. I chap. 18, passed in 1719, which was made to restrain the creation of associations with shares transferable at pleasure, which after the introduction of the South Sea bubble were used as means for the wildest forms of stock-gambling, and indulged to such a mad and ruinous extent as to require the check of legislative prohibition. When mutual benefit and aid societies having funds accumulated from small monthly subscription, were adopted about the beginning of the present century, it was much doubted whether they did not fall within the prohibitions of the stock-gambling statutes, the provisions of which are numerous and very complicated. To remove these doubts, and to reduce into a system the manner of conducting these and other joint-stock associations having legitimate and beneficial objects, and to give greater facilities for the management and enforcement of the rights of these companies, the statutes of Geo. IV, superseded by 7 Wm. IV, and 7 and 8 Vic., were passed. These statutes are in no sense enabling statutes, but are in the nature of restraining enactments, requiring certain formalities, not at common law necessary, to give vitality to the association coming within their purview, and subjecting them to a certain inquisitorial control by boards of justices, &c. But these statutes, although none of them in force in this District, may be invoked for one purpose, viz: to show the sense of the people and parliament of Great Britain that associations of this sort are of most beneficial tendency; and, pruned of abuses to which some of them are liable, are of great utility to the public, especially to the poorer classes, by encouraging thrift and supplying them with advantageous agencies for the accumulation and management of the savings of their daily labor.

But, altogether outside of any decisions, touching joint-

stock associations, it is well settled that if profit be derived through a *bona fide* partnership, the dealing with money is not usurious. Gilpin *vs.* Enderby, 5 Barnwell and Alderson 945; Fereday *vs.* Horden, 1 Jacobs 144. The reason running through all these cases is, that the principal sum is in hazard by the liability of the partners for the debts of the concern to third persons; and the principle is not varied by the fact, that under the particular arrangements of the business any loss is highly improbable. An inspection of the scheme in this case will make apparent to any one, without pausing to illustrate it, that each member is interested in every dollar belonging to the concern; the greater the profits the less will be the amount of his weekly contribution to raise the common fund to the distributive amount; and if no profit be made, he will contribute all that he ultimately withdraws, and will only derive the benefit, a substantial one indeed, of the saving process. On the other hand, in payment of officers salaries, rent, and all other expenses, he is liable individually for all the debts of the concern; and therefore, to all legal intents and purposes, is a partner.

  Independent of the partnership view of the case, as was argued at the bar, the contract may be likened to the purchase by the society from its member of an annuity. For the amount advanced or paid to him he agrees to pay double the monthly instalment on the shares represented during the life of the association. The duration of the society is altogether uncertain; it may, and probably will, expire before the monthly payments amount in the aggregate to the price he receives with simple interest, or it may continue until these exceed that amount. The purchase and sale of annuities and rent charges differ from a loan at interest in this: that in case of a loan the principal sum, as such, is to be repaid at all events. In the case of annuities and rent charges, redeemable, it may be repaid at the will of the purchaser, nor does it make any difference that the annuity is dependent upon a contingency other than the duration of a human life. Both in annuities and rent charges purchased the stated payments may amount to much more than the interest upon the price paid, and be so great as in all human probability before the

termination of an annuity largely to exceed both principal and interest; yet the validity of the purchase is not thereby effected. The case of Lloyd and Scott, decided in 4 Peters, and afterwards tried in this Court upon procedendo, (4 Cranch C. C., 206,) on an issue of usury before the jury, was the purchase of an annuity or rent charge, very like in its practical results to the present case; and in that case the Court held that the covenant that a party might re-purchase within a given period at the same price, and upon the re-payment of that price, with all arrears of instalments of the annuity which was equivalent to 10 per cent. per annum, to be entitled to re-conveyance of the premises charged, did not give the transaction in law the character of a loan so as to taint it with usury, provided the original purchase was in good faith. But it is further said, that although the sale of the shares upon a discount, coupled with an agreement to pay the double monthly instalment, may not be usurious, con-sidered in the light of a partnership dealing, or an annuity sale, or a contract in which the principal sum is not, at all events, returnable, together with more than legal interest, yet the imposition of fines of ten cents for each dollar of monthly dues not punctually paid is usurious interest upon the monthly dues. This does not appear to me to be either a just construction of that part of the regulations of the society; nor if it were meant to be a reservation of interest, as interest would it be usurious ? The cases of Roberts *vs.* Tremayne, Co. Jac. 509; Floyer *vs.* Edwards, Cowper, 113; and Wells *vs.* Girgling, 4 Moore 78; same case, 1 B. & Bing. 447; all deciding that, where the party may relieve himself from any interest at all by payment at a day certain, the reservation of more than legal interest in case of default is not usurious within the statute. But the fair construction of this part of the regulations of these societies seems to be that, in as much as punctuality and exactitude are essential to the just and profitable conduct of the business of the concern, the reser-vation of legal interest on non-payment of monthly dues being so inconsiderable, hard to compute and next to im-possible to collect and account for, it would be no compen-sation to the society for these defaults, nor any security

against their frequent recurrence. Hence their rules fix as a measure of liquidated damage for each default, under the name of a fine, a certain small sum, in this and most other societies 10 cents on every dollar. The 16th rule of the articles in the case of Silver *vs.* Barnes, already cited, call these fines by the name of "liquidated damages."

Now, if the contract in this case was not usurious, was it an unconscionable and oppressive bargain, which a Court of equity ought to relieve against?

By reference to the tables of calculation which are published in the explanatory treatise on these subjects, or which, with a little trouble, may be calculated by any person for himself, it will appear that the average duration of these societies is from eight to nine years, dependent upon the range of premium which their advances command. A society with an average premium of 35 per cent., which the complainant in this case paid will wind up in eight years and a fraction. What does an advance at thirty-five per cent. discount cost the member during eight years, as compared with the admitted standard of moderation a loan at six per cent.

| | | |
|---|---|---|
| $400 at thirty-five per cent. discount is | $260 | 00 |
| Interest at six per cent. for eight years is | 124 | 80 |
| | $384 | 80 |
| Double monthly dues for eight years at $2.00 per share | $384 | 00 |
| Balance in favor of an advance over an ordinary loan at six per cent. is | $ | 80 |

Thus it appears in point of fact, that if the complainant were faithfully to comply with the terms of his contract, and be in no default for monthly dues, instead of paying more than legal interest he would get the advance and use of $260 for eighty cents less than simple interest, while the profit to the co-partnership would be the active employment of his and other weekly dues in the interval.

Suppose the contract be terminated, and the complainant released from his connection with the society, and he claims in his bill, by payment of the advance......... ....... $260 00

Brought forward, $260 00

Legal interest thereon for five years and seven
months..................................................... 87 10

                     $347 10

Crediting the account with dues paid as per answer 209 00

Balance due to the society................. ................. $138 10

     Suppose, on the other hand, the complainant be released
upon the terms offered by the respondents in their answer,
the account will stand:

Debtor to amount advanced......... ...................... $260 00

To amount of fines, as per detail statement............ 14 00

Whole amount of dues prior to and after advance..... 282 00

                     $556 00

Crediting him by estimated value of his shares.. ..... $200 00

And by monthly dues already paid....................... 209 00

                     $409 00

The balance claimed by them is........................... $147 00
or $8.90 more than by calculation of simple interest.

     Suppose, on the other hand, that the advance be restored
to the society, and the complainant restored to the condition
of a member having received no advance, which, under the
terms of the articles of association, is all that the society can
insist upon without his consent to a dissolution of their rela-
tions, the account would be stated thus:

Debtor to advance............................................ $260 00

To amount of fines incurred................................ 14 00

Total dues prior to and since his advance............... 282 00

                     $556 00

And crediting the dues already paid in.................. $209 00

Leaving an apparent balance of............................ $347 00

     But to show the true attitude of the parties it will be
remembered that this balance of $347 represents within itself
his remaining interest in the association and the value of his
ultimate distributive share. This share he may sell to any

third person or to the society, as they offer by their answer, as its market value of $200, and the balance against him will be exactly as before $147, or less than $9 above legal interest for the use of the advance for five years and upwards. Suppose the member resorts to the other alternative of voluntarily quitting the society after having enjoyed the benefit of his advance for five years and seven months. He has a right to do it without the assent of the association, as provided in their constitution, by returning the money advanced, with interest thereon, paying all fines incurred, and being credited with the dues already paid in.

The account would then be:

| | | |
|---|---:|---:|
| Advance.......................................................... | $260 | 00 |
| Interest for five years and seven months............... | 87 | 10 |
| Fines incurred.................................................. | 14 | 00 |
| | $361 | 10 |
| Amount of dues paid in. ................................... | 209 | 00 |
| Balance due the association............................... | $152 | 00 |

or $14 more than simple interest for the use of the advance during five years and seven months.

No man who will give a thought to the subject can call a contract voluntarily entered into, which presents these results, unconscionable or oppressive.

But suppose that the forfeitures and fines imposed upon a defaulting member were much larger than those claimed in the present case, would it be the province of this Court, upon the bill of the defaulter, to relieve him from the consequences of his own contract and his voluntary acts? The distinction must always be remembered between calling upon a Court of equity to relieve against a forfeiture or to enforce a forfeiture. In the latter case they may refuse to interfere. But the doctrine of relief has been restored from confusion of the oldest decisions and narrowed to this, that unless the Court can clearly see that full compensation can be made, and the forfeiture was not voluntarily and persistently incurred, it will not relieve, but let the party abide by the contract he has formed. In Story's Equity, sec. 1323, it is thus summed up:

"The doctrine seems now to be asserted in England, that in all cases of forfeiture for breach of any covenant, other that a covenant to pay rent, no relief ought to be granted in equity, unless upon the ground of accident, mistake, fraud or surprise, although the breach is capable of a just compensation." And in Section 1325 he gives the special phase of reasoning, which fits the present and like cases, viz: "It is upon grounds somewhat similar, aided by considerations of public policy, and the necessity of a prompt performance in order to accomplish public or corporate objects, that Courts of equity, in cases of non-compliance by stockholders with the terms of payment of their instalments of stock at the time prescribed by which a forfeiture of their share is incurred under the by-laws of the institution, have refused to interfere by granting relief against such forfeiture."

In the case of Sparks *vs.* Liverpool Water Works, 13 Vesey 433, which was a case of purely accidental forfeiture of stock in a corporation, under one of its by-laws requiring instalments to be paid at a certain time, the Master of the Rolls uses language precisely adapted to the business and objects of societies organized upon the principles we are considering. He says: "It is essential that the money should be paid, and that they should know their situation. Interest is not an adequate compensation even among individuals, much less in these undertakings. In particular cases interest might be a compensation, but in a majority of cases it is no compensation from the uncertainty in which they may be left. The effect is the same whether money has been paid or not. They know the consequence."

I agree with those enlightened judges and chancellors of England, Lord Eldon, and a host of others, who have always regretted that Courts of equity had ever undertaken to relieve against forfeitures breaches of private contract. They have all admitted it to be "delicate and dangerous," and some have denounced it as "mischievous and arbitrary." See Eaton *vs.* Lyon, 3 Ves. 693; Sanders *vs.* Pope, 12 Ves. 291; cases of Hill *vs.* Barclay, 16 Ves. 403; and 18 Vesey 58; Bracebridge *vs.* Buckly, 2 Price 206; Rolf *vs.* Harris, *ibid*

note p. 210, and other cases cited in Story's Equity, Sec. 1320 and Sec. 1325.

For myself, I adopt the maxim laid down by Cranch, C. J., in Lloyd and Scott, on motion for a new trial, 4 C. C. C. Rep. 223: "Every man has a right to make what contracts he pleases, if not restrained by some law; and justice and equity require that such contracts should be executed, if fairly made."

I am of the opinion that upon the case made by the answer the special injunction should be refused.

Judge Morsell concurred in the foregoing opinion.

Judge Dunlop dissented, and delivered a separate opinion as follows:

A voluntary, unincorporated association, called the Potomac Building Association, was formed in Washington in the year 1850, by the complainant and others. The constitution of the society provided that a monthly subscription of $1 should be paid by the members in respect of each share held by them until the joint contribution were of an amount to enable each member to receive $200 in respect of each share. Power was given to the society to advance to any member his share at a discount, such member paying an additional $1 monthly on each share, as aforesaid, and executing a bond and deed of trust to defendants to secure the due payment of his future subscriptions. The complainant took an advance upon his two shares at a discount of 35 per cent. per share; that is to say, on his two shares, estimated as worth $400, $140 was deducted for discount, and he received in cash from the company $260, and executed to the defendants, the Trustees of the Building Association, the bond and deed of trust set out in the proceedings in this cause for securing the payment of the future subscriptions. The deed of trust contained no covenant for the payment of the advance. The complainant having failed to pay his dues, &c., for more than 60 days, the defendants as trustees, advertised to sell for the amount claimed by the Building Association in their account filed, which is in the following terms:

JNO. JOHNSTON, TO POTOMAC BUILDING ASSOCIATION.

DR.

| | | | |
|---|---|---:|---:|
| 1851. May 5. To cash advanced on two shares of stock, | | | $260 00. |
| Monthly dues for two shares of stock for seven months, prior to taking advances, at $1 per share, | $14 00 | | |
| Dues from May, 1851, to Dec., 1856, five years and seven months, at $2 per month each. | 268 00 | | |
| | | 282 00 | |
| Fines to Dec., 1856, as per statement in detail, | | 14 00 | |
| | | $556 00 | |

CR.

| | | |
|---|---:|---:|
| By amount of dues paid in, as per statement in detail herewith, | $209 00 | |
| By estimated value of his two shares of stock, by actual sales made Dec. 1, 1856, | 200 00 | |
| | 409 00 | |
| Balance due by Johnston, | | $147 00 |

Johnston, the complainant, filed his bill in this case, charging *usury* in the contract, and claiming to set it aside and to avoid the deed of trust on payment of principal and interest on the advance, and for an injunction to stay the sale by the trustees. The defendants, in their answer deny usury, and assert their right to sell for the balance claimed by them in the foregoing account.

The complainant was a stockholder in the company to the amount of two shares, and had signed the constitution. The shares at the winding up were to be made worth $200 each. Johnston's two shares, $400 less $140, the premium bid by him for the advance, would be worth $260 at the winding up of the association, and to be accounted for to him in his settlement with the company at that value. The articles of the constitution of the Building Company, which bear on this case, are as follows:

"Art. 2, Section 3. Each and every stockholder, for each and every share of stock that they hold in this association, shall pay the sum of $1 in bankable funds, on the first Monday of each and every month, to the treasurer, or such other person or persons as shall from time to time, by the laws or regulations of the association, be authorized to receive the same, until the value of the whole stock shall be sufficient to divide to each share of stock the sum of $200, at which time the association shall determine and close."

"Art. 8, (Advances) Section 1, 2, 3 and 7.

Section 1. "Every stockholder, for each share, entitled to purchase an advance of stock of $200, to be paid from the funds of the association," &c.

Section 2. "When the funds of the association warrant it, one or more advances shall be disposed of by the secretary to the highest bidder, at regular meetings of stockholders, not under par," &c.

Section 3. "Whenever a stockholder shall purchase an advance, he shall pay, or cause to be deducted, the premium offered by him or them for the same, and shall secure the association by bond, deed or trust, and policy of insurance, the policy to be assigned to the trustees upon the trust for such amount as the board of directors may deem sufficient to cover the amount advanced, with all fines, costs, and charges which may accrue thereon."

Section 7. "Stockholders taking an advance from the funds of the association shall, from the time of purchasing such advance, pay to the treasurer $2 per month for every share of stock on which such advance may have been made, (instead of $1, as hereinbefore provided, for those who have received no advance) and if the same shall be suffered to remain unpaid more than two months, the board of directors may compel payment by ordering proceedings on the bond and deed of trust according to law."

This additional $1 per month on each share to a stockholder buying an advance is $12 per year, or 6 per cent., the legal rate of interest, valuing the share at $200, which is its computed value on the close of the concern.

Johnston bought an advance on his two shares at 35 per

cent. premium received $260 in money, paid or had deducted $140 premium, gave his bond to the treasurer for $400, conditioned to pay monthly dues of $2 per share on each share, and all fines, until the value of the whole stock shall be sufficient to divide to each share of stock $200, and also a deed of trust to Messrs. Ratcliff and Clark to secure these dues and fines, &c.

The condition of the bond is worthy of special notice, and shows plainly the nature of the contract, and together with the deed of the trust, makes apparent the rights of the association and the duties and obligations of the borrower, and, as I construe them, are designed to carry into effect the true meaning of the constitution of the Building Company.

The bond of date 15th May, 1851, is in the sum of $400. The condition of the bond is in these words:

"Whereas the said John Johnston, a stockholder to the extent of two shares in said association, has, by virtue of and in accordance with the provisions of the constitution and obligation attached thereto of the said association or joint-stock company, received advances from the funds of the said association, advances on said stock; now if the said John Johnston, or his heirs, executors and administrators, shall well and truly pay, or cause to be paid unto the said Ephraim Wheeler, treasurer as aforesaid, or to his successor in office, the sum of $2 on each of the shares of stock on which he has received advances as aforesaid, monthly, and every month, commencing with the first Monday in June, 1851, and continues to pay the same on the first Monday of each and every month thereafter, together with any fines and forfeitures for the non-payment of said monthly dues, as is provided in said constitution and obligation as aforesaid, until the funds of the said association shall divide to each share of stock the sum of $200, then this obligation to be void, or else to remain in full force and virtue in law."

And the deed of trust to Messrs. Ratcliff and Clarke, of the date the 2nd of June, 1851, under which they now claim to sell complainant's house and lot, after reciting said bond and its condition, in substance as above set forth, and that said deed was to secure the said monthly dues, fines, and for-

feitures, conveyed to them the property described in said deed upon the following trusts, that is to say:

"If the said Johnston, his heirs, executors and administrators shall fail to pay the said monthly payments and the fines and forfeitures aforesaid, so that any one or more of the same shall be due and unpaid for the space of sixty days, then the said writing obligatory shall be deemed and taken as forfeited, and upon request in writing, &c., the trustees shall sell, &c., and convey to the purchaser, &c., and out of the proceeds of the sale pay first the costs and charges attending said sale; secondly, pay to the treasurer whatever sum or sums of money shall then be found due by the said John Johnston to the said association, on an account to be stated by the treasurer, in which the said Johnston shall be charged with the sum of money received by him from the said association, and the monthly payments, fines and forfeitures intended to be secured by these presents, and the said writing obligatory, and credited with the amount of dues paid by him, and the residue, if any, pay over to the said Johnston, his heirs and assigns, &c."

It is evident that the account herein to be stated, and the whole terms of the bond and deed of trust contemplate Johnston, to whom the advance has been made on the two shares as still a partner, and to continue to be so till the final close of the association, when the two shares will be of the value of $200 each, and so to be estimated in the final settlement between him and his co-partners, less the premium bid by him at the time of the advance, and it is on the assumption only that he is so to continue a partner that he can be made to pay dues up to the close of the concern, when each share is to be made of the value of $200. As such partner and contributor he is to share in the profits, present and to come, of the partnership.

The English cases referred to in the argument, clearly the transaction of usury are based upon the assumption that the party to whom the advance is made is a partner at the time of the advance and when the advance is repaid, and so a sharer in the profits then and to the close of the concern. It can in no other sense be said to be a dealing in partnership

effect by the partners *inter se*. In the case of Silver *vs.* Barnes, 6 Bingham N. C. 180; Tindal, Ch. J., says: "A motion has been made for a new trial, on the ground of misdirection, but we think the case was properly left to the jury. The question was whether the transaction was a loan of money or a dealing with the partnership. If it was a loan it was usurious. We think it was a dealing with the partnership fund, in which the defendant had an interest in common with the other members of the society, and that it was not a loan. The defendant was interested in the fund when the money was advanced and when it was repaid. The rules of the society are, in effect, a mere agreement by partners that their joint contributions shall be advanced for the use of the one or the other, as occasion requires, and the transaction in question was not a borrowing by the maker of the note from the payees. In a case before Alexander Ch. Baron, in the year 1828, he held an advance, from a similar society to one of its members, to be a partnership transaction and not a loan."

If the partner receiving the advance is turned out of the concern and dispossessed of his profits by an arbitrary valuation of the two shares, as is claimed in the account presented with the defendants' answer, who value and take the shares to the use of the association at $100 each, when they are to be made worth $200 each, less the premium bid on them in part by the complainant's monthly contributions to the end and winding up of the association, then he is no longer a dealer in partnership effects, having a common interest with his co-partners in all profits to the close, but an outsider and a borrower of funds owned by strangers, and in that light the contract is clearly usurious.

I refer to the case of Bechtold *vs.* Brehm, 26 Penn. St. 527, decided by the Supreme Court of Pennsylvania in 1856.

The additional monthly payments of $12 a year on a computed $200 share, greatly exceeds the legal rate of interest on the advance of $130 on that share, deducting 35 per cent. premium bid by the complainant and retained by the association when the advance was made. If the complainant is not a partner, and is subject to be ousted before the concern closes, he is not receiving his share by anticipation; he is not

a sharer of profits present and to come. In that sense, by whatever name the transaction is called, it is a mere loan of money. It is a loan at a higher rate of interest than the law allows for the forbearance or giving day of payment, and the bond and deed, to secure the repayment of the principal, in which aspect the defendants treat said bond and deed in their account rendered (as I think, wrongfully), being securities tainted with usury, are both void by the statute.

I entertain some doubt whether the contracts of this Building Association, as to advances, even when executed in good faith, according to the terms of their written Constitution, are free from usury. Some of the English cases certainly go to that extent. The doubts there have been removed by statutory provisions, which legalize these advances and provide for the imposition of fines on members for failure to pay monthly dues within prescribed limits; the Legislature of that country thinking such societies of beneficial tendency, and calculated to elevate the social condition of men, having no other means than the fruits of their daily labor. Their expediency and utility is not so certain here, where any laboring man, with the high rate of wages prevailing in this country, can, with the exercise of ordinary prudence and carefulness, soon secure a homestead without involving himself in the expensive machinery of a Building Association, the articles of which are not easily understood by unlearned people, and very liable to be perverted to their oppression. These considerations, however, belong to the Legislature, and not to the Courts of Justice, and if such associations are deemed beneficial, they ought to be regulated and protected by statute, as has been done, it is believed, in some of our States.

The fines which, by their constitution, the members agree to pay in default of punctuality in the monthly dues, are in the nature of forfeitures, and are, in fact, sometimes so called by the society itself. If they were called liquidated damages their nature would not be changed. All the Courts in this country, as I understand Kent, Story and Marshall, both at law and in equity, are unwilling to enforce forfeitures and lean against them.

In England they have been sanctioned by the statutes to which I have referred. In the absence of any statutes here, I think we ought only to enforce payment of the dues by directing our Auditor to allow interest on them from the periods when they accrue and fall due.

As the Trustees in this case claim to sell the complainant's property upon an account stated, and for a sum not warranted by law, nor even by the constitution of the Building Society itself, I think the injunction ought to be granted, and to have effect till the cause is fully heard.

Notes to the case.

As to fines, penalties and forfeitures, the following cases are to the point: Skinner *vs.* Dayton, 2 Johnson Ch. Rep. 535; Livingston *vs.* Thompkins, 4 Johnson Ch. Rep. 431; 2 Story Equity Jurisprudence, Sec. 1313, 1314, 1315 and 1316; Hill *vs.* Barclay, 16 Vesey 403 and 405 and 18 Vesey 58; Sparks *vs.* Company of Proprietors Liverpool Water Works, 13 Vesey 428; Tayloe *vs.* Sandiford, 7 Wheaton 13; Reynolds *vs.* Pitts, 19 Vesey 140.